UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPEC'S FAMILY PARTNERS, LTD., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-16-438 |
| | § | |
| THE HANOVER INSURANCE COMPANY, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is plaintiff Spec's Family Partners, Ltd.'s ("Spec's") motion for partial summary judgment (Dkt. 63) and defendant Hanover Insurance Company's ("Hanover") cross-motion for partial summary judgment (Dkt. 65). Also pending before the court is: (1) Hanover's request for judicial notice (Dkt. 68) and Spec's responsive motion to strike (Dkt. 71); and (2) Hanover's motion for leave to submit supplemental authority (Dkt. 77). Having considered the motions, responses, replies, and applicable law, the court is of the opinion that Spec's motion for partial summary judgment (Dkt. 63) should be GRANTED IN PART and DENIED IN PART. Hanover's motion for partial summary judgment (Dkt. 65) should be DENIED. Hanover's request for judicial notice (Dkt. 68), Spec's motion to strike (Dkt. 71), and Hanover's motion for leave to file supplemental authority (Dkt. 77) should all be DENIED AS MOOT.

**I. BACKGROUND**

This is an insurance dispute concerning Spec's claim for coverage following two data breaches of Spec's credit card payment system. Dkt. 6 at 2.

## A.     The Breach and Underlying Claim

The central facts of this case are not in dispute. Spec's is a family-owned retail chain. *Id*. Spec's accepts payments from customers using Visa or MasterCard through a third-party transaction service provided by First Data Merchant Services, LLC ("First Data"). *Id*. In 2001, Spec's entered into a contract with EFS National Bank for credit card transaction services (the "Merchant Agreement"). *Id*. First Data is the successor to EFS National Bank in the Merchant Agreement. Dkt. 6 at 2.

Between October 2012 and February 2014, Spec's credit card payment system suffered from two data breaches, resulting in the loss of customer information and credit card numbers. Dkt. 6 at 2. Visa and MasterCard demanded that First Data pay "liability assessments" to cover the resultant damages. Dkt. 63 at 11. In December 2013, to cover these liability assessments, First Data sent a demand letter to Spec's for about $7.6 million. Dkt. 64-3 at 21–22. The letter also alleged that Spec's was "non compliant with the Payment Card Industry Data Security (PCIDSS) requirements" and demanded that Spec's upgrade its security. *Id*. In March 2015, First Data sent a second demand letter for an additional $1.9 million. Dkt. 64-3 at 24–25. Altogether, between December 2013 and March 2015, First Data demanded that Spec's pay over $9.5 million, make significant changes to Spec's security systems, and provide First Data with extensive documentation (collectively, the "Underlying Claim"). Dkt. 64-3 at 21–25. Further, to satisfy its demands, First Data incrementally withheld an alleged $4.2 million from Spec's daily payment card settlements and placed the funds in a "Reserve Account." Dkt. 63 at 12. Spec's did not consent to this withholding and First Data did not file suit or otherwise establish its right to the withheld funds. *Id.*

2

**B.     The Policy**

Hanover issued an insurance policy to Spec's for the period between October 28, 2013 to October 28, 2014 (the "Policy"). Dkts. 64-2, 64-3. The Policy provides that Hanover has a duty to defend against "Claims" made against Spec's. The relevant provisions read:

1. Defense of Claims:

We have the right and duty to defend "Claims," even if the allegations in such "Claims" are groundless, false or fraudulent. We have no duty to defend "Claims" or pay related "Defense Expenses" for "Claims to which this insurance does not apply."

Dkt. 64-2 at 15.

2. Definition of Claim

[A] "Claim" means: (1) Any written demand presented for monetary "Damages" or non-monetary relief for a "Wrongful Act"; or (2) Any complaint or similar pleading initiating a judicial, civil, administrative, regulatory, alternative dispute, or arbitration proceeding, including any appeal resulting from it, to which an "Insured" is provided notice and which subjects an "Insured" to a binding adjudication of liability for monetary or non-monetary relief for a "Wrongful Act . . . ."

Dkt. 64-2 at 26–27. The Policy also contains the following exclusion which precludes coverage for claims based upon a contract:

N. 'Loss' on account of any 'Claim' made against any 'Insured' directly or indirectly based upon, arising out of, or attributable to any actual or alleged liability under a written or oral contract or agreement. However, this exclusion does not apply to your liability that would have attached in the absence of such contract or agreement.

Dkt. 64-2 at 30 ("Exclusion N").

**C.     The Parties' Defense Funding Agreement and the Tennessee Litigation**

On April 8, 2014, Spec's notified Hanover of First Data's December 2013 demand letter. Dkt. 6 at 2–3; Dkt. 19 at 15. Hanover and Spec's engaged in a series of exchanges regarding Hanover's duty to defend. Dkt. 6 at 2–3. Ultimately, on November 2014, Hanover and Spec's

3

entered into a Defense Funding Agreement ("DFA") in which Hanover consented to the retention of Haynes and Boone, LLP as defense counsel in litigation regarding the Underlying Claim. Dkt. 64-1 at 4.

In December 2014, Spec's initiated a lawsuit in United States District Court for the Western District of Tennessee against First Data (the "Tennessee Litigation"). Dkt. 64-1 at 4. Hanover eventually refused to pay the litigation expenses for the Tennessee Litigation. *Id.* Following the March 2015 demand letter, Spec's again notified Hanover of First Data's claims. Dkt. 63 at 12. However, Hanover continued to refuse to cover expenses for the Tennessee Litigation. Dkt. 64-1 at 5.

**D.     The Current Suit**

Spec's then filed suit against Hanover in this court, asserting causes of action for breach of the Policy and breach of the DFA. Dkt. 6 at 5–6. Spec's also sought declaratory judgment on Hanover's duty to defend, damages under Chapter 542 of the Texas Insurance Code, and attorneys' fees. *Id*. at 6–7. Hanover subsequently moved for judgment on the pleadings. Dkt. 19. The court granted Hanover's motion, holding that First Data's claim against Spec's arose out of the contract between Spec's and First Data and therefore fell within Exclusion N of the Policy. Dkt. 42. Because Exclusion N prevented coverage under the Policy, the court held that Hanover did not have a duty to defend Spec's against First Data's claims. *Id.*

On appeal, the Fifth Circuit reversed. *Spec's Family Partners, Ltd. v. Hanover Ins. Co.*, 739 Fed. App'x 233 (5th Cir. 2018). The court held that First Data's claims against Spec's "implicate[d] theories of negligence and general contract law that imply Spec's liability for the assessments separate and apart from any obligations 'based upon, arising out of, or attributable to any actual or alleged liability under' the Merchant Agreement." *Id.* at 239. Therefore, the court reasoned,

4

Exclusion N did not excuse Hanover from its duty to defend Spec's against First Data's claims. *Id.* The court remanded to this court for further proceedings. *Id.* at 240.

The parties have now filed cross-motions for partial summary judgment. Dkts. 63, 65. Spec's still seeks a declaratory judgment on Hanover's duty to defend, damages under Chapter 542 of the Texas Insurance Code, and attorneys' fees. Dkt. 63 at 30. However, Spec's current motion only seeks summary judgment on the fact of Hanover's liability and expressly reserves the determination of the amount of damages and attorney's fees for trial. Dkt. 63 at 8 n.1.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

### B. Duty to Defend

Under Texas law, courts follow the "eight-corners rule" to determine whether an insurer has a duty to defend. *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999). "Under this rule, courts compare the words of the insurance policy with the allegations of

the plaintiff's complaint to determine whether *any* claim asserted in the pleading is potentially within the policy's coverage." *Id.* "The duty to defend analysis is not influenced by facts ascertained before the suit, developed in the process of litigation, or by the ultimate outcome of the suit." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir. 2004). Rather, it is determined by examining the eight corners of the pleadings and the policy. *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008). All doubts with regard to the duty to defend are resolved in favor of the duty. *Id.* Courts applying the eight-corners rule "give the allegations in the petition a liberal interpretation." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). Courts must not, however, "read facts into the pleadings, . . . look outside the pleadings, or imagine factual scenarios which might trigger coverage." *Id.* at 142.

The insured has the burden of showing that a claim is potentially within the coverage of the policy. *Federated Mut. Ins. Co.*, 197 F.3d at 723. However, "if the insurer relies on the policy's exclusions, it bears the burden of proving that one or more of those exclusions apply. . . . Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion." *Id.* Courts "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 623, 666 (Tex. 1987). However, the "rules favoring the insured . . . are applicable only when there is an ambiguity in the policy; if the exclusions in question are susceptible to only one reasonable construction, these rules do not apply." *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 99 F.3d 695, 701 (5th Cir. 1996).

6

## III. ANALYSIS

### A. Duty to Defend as to the Demand Letters

As a threshold matter, there is some confusion as to whether Hanover's duty to defend as to the Demand Letters has been resolved. *See, e.g.*, Dkt. 63 at 17, 21. As Hanover concedes, it has. *See* Dkt. 65 at 23 n.3. Hanover acknowledges that the Demand Letters themselves are a "Claim" under the Policy. Dkt. 75 at 2. Hanover also acknowledges that the Fifth Circuit ruling established that Exclusion N does not apply to Claims arising directly out of the Demand Letters. Dkt. 65 at 23 n.3. Under the eight-corners rule, the Fifth Circuit determined that the Demand Letters themselves triggered the duty to defend. *Spec's Family Partners, Ltd.*, 739 Fed. App'x at 239. Spec's again raises the issue in its pending motion for summary judgment, but Hanover does not directly address the issue. *See* Dkt. 65 at 26 (Hanover's Motion for Partial Summary Judgment) (requesting only a "finding that Hanover has no duty to cover Spec's for attorneys' fees and costs incurred for Spec's prosecution of its affirmative claims in the [Tennessee Litigation]"). Therefore, the court GRANTS Spec's motion for summary judgment insofar as it seeks a declaratory judgment that Hanover has a duty to defend Spec's against the Claims in the Demand Letters themselves. *See* Dkt. 63 at 17.

### B. The Underlying Claim

The court now turns to the crux of the parties' current dispute: whether Hanover has breached its duty to defend by refusing to fund the Tennessee Litigation.

At the outset, Hanover disputes the nature of the Underlying Claim for a second time. In its motion for judgment on the pleadings, Hanover argued that Spec's claims in the Tennessee Litigation, not the letters from First Data, comprised the relevant "Claim" for purposes of this litigation. Dkt. 42 at 6–8. However, the court rejected this argument:

> Hanover's argument . . . appears to ignore the existence of the two demand letters, which form the Underlying Claim. Dkt. 19, Exs. C, D. The court rejects any argument that there is no underlying claim and concludes the eight corners rule is applicable to the duty to defend analysis. The court will consider the four corners of the demand letters and the four corners of the Policy. Dkt. 19, Exs. A, C, D.

Dkt. 42 at 8. Now, in the summary judgment stage, Hanover makes a similar argument: that the Tennessee Litigation does not concern the "Claims" made by First Data. Dkt. 65 at 12. Instead, Hanover asserts that "the 'Claims' in the Demand Letters were resolved by September 11, 2014" after First Data withheld funds from Spec's, Spec's submitted the requested documentation concerning safety standard compliance, and Spec's appeals to MasterCard were resolved. Dkt. 65 at 13. Hanover concludes that "Spec's filed the [Tennessee Litigation] to recover damages from First Data for First Data's own wrongful conduct" under the Merchant Agreement, and therefore the Tennessee Litigation is "not an extension of Spec's defense of the 'Claims' in the Demand Letters." Dkt. 65 at 14. In essence, Hanover is again arguing that the court should consider the substance of the Tennessee Litigation, not the First Data Demand Letters, in determining whether Hanover has a duty to defend.

However, Hanover's argument fails for two reasons. The first, and most glaring, is that the Claims in the Demand Letters could not have been resolved by September 2014 because First Data did not send its second Demand Letter until March of 2015. Dkt. 64-3 at 24–25. Spec's and First Data were engaged in an ongoing dispute about Spec's liability when Spec's filed the Tennessee Litigation in December of 2014. The evidence simply does not support Hanover's theory that First Data's Claims were somehow "resolved" prior to Spec's filing suit.

Second, Hanover does not dispute that First Data unilaterally withheld $4.2 million to compensate itself for the Claims made in the Demand Letters. Rather, Hanover expressly

8

acknowledges that Spec's filed suit to recover damages for First Data's "withholding bankcard settlements to fund the payments of fines and assessments." Dkt. 65 at 14. Thus, the focus of the Tennessee Litigation is Spec's liability to First Data for the Claims made in the Demand Letters; the Tennessee Litigation would not exist in the absence of First Data's Claims. The Tennessee Litigation is therefore an "extension" of the Claims in the Demand Letters, not an independent claim made by Spec's. *See* Dkt. 65 at 14.

**C.     Duty to Defend**

However, it does not necessarily follow that the Tennessee Litigation triggers Hanover's duty to defend. Hanover contends that it is not obligated to fund the Tennessee Litigation because: (1) the Policy creates a duty to defend claims against Spec's, but the Tennessee Litigation was filed by Spec's and therefore does not qualify as a defensive action; and (2) all of Spec's claims in the Tennessee Litigation arise out of the Merchant Agreement between Spec's and First Data, and therefore are excluded from Policy coverage under Exclusion N. Dkt. 65 at 14–19.

1. *Whether the Tennessee Litigation is Defensive*

Hanover primarily argues that, under the Policy, its duty is limited to defending Claims and paying related "Defense Expenses." Dkt. 65 at 14. The Policy defines "Defense Expenses" as "[a]ny reasonable and necessary legal fees and expenses, including attorney fees and expert fees, incurred in the defending and appeal of a 'Claim.'" Dkt. 64-2 at 27. However, Spec's initiated the Tennessee Litigation by filing suit against First Data. Dkt. 63 at 13. Therefore, Hanover argues, the Tennessee Litigation is a "lawsuit brought *on behalf of* Spec's" and is not a Claim "*made against* Spec's." Dkt. 65 at 14 (emphasis in original) (quotations omitted).

Hanover primarily relies on the Fifth Circuit's decision in *Aldous v. Darwin National Assurance Co.*, 851 F.3d 473 (5th Cir. 2017), *vacated in part on other grounds*, 889 F.3d 798 (5th

Cir. 2018)). In that case, lawyer and plaintiff Charla Aldous filed suit against a former client for failing to pay owed attorney's fees. *Aldous*, 851 F.3d at 476. The client filed counterclaims against Aldous, alleging breach of fiduciary duty, duress, breach of oral contract, fraud, and professional negligence. *Id.* These counterclaims triggered a duty to defend by Aldous's professional liability insurer, Darwin National. *Id.* While Darwin agreed that it was responsible to defend Aldous against the client's counterclaims, it refused to pay for any litigation expenses related to Aldous's affirmative claims against the client for failure to pay the owed attorney's fees. *Id.* at 477.

Aldous sued Darwin and sought, *inter alia*, a declaratory judgment that Darwin was liable for the "costs associated with the prosecution of her affirmative claims against Hill to the extent those affirmative claims were inextricably intertwined with her defense." *Id.* The district court granted summary judgment on Aldous's claim, and the Fifth Circuit affirmed. *Id.* at 483–84. The Fifth Circuit observed that Aldous provided no Texas state case law to support her argument. *Id.* at 483. Although the court acknowledged that the duty to defend was broad under Texas law, the court ultimately held that "the duty to *defend* the entire suit does not give rise to a duty to prosecute claims helpful to or even inextricably intertwined with that defense." *Id.* (emphasis in original).

Hanover argues that *Aldous* stands for the proposition that the duty to defend can never include the duty to fund the prosecution of affirmative claims, even if they are "inextricably intertwined" with covered defensive claims. Dkt. 65 at 16. However, *Aldous* does not govern the outcome here for two reasons. First, this case differs from *Aldous* in a significant way: in *Aldous*, the uncovered offensive claims (*i.e.*, the client's failure to pay) arose from a different set of facts from the covered defensive claims (*i.e.*, Aldous's alleged professional negligence). Aldous procured insurance to mitigate the risks of a professional liability suit—not to mitigate the risk of a client's refusal to pay. *See Aldous*, 851 F.3d at 476. Here, in contrast, First Data made affirmative claims

10

against Spec's via the Demand Letters. Dkt. 64-3 at 24–25. First Data then reached into Spec's pocket—which First Data was uniquely positioned to do because of its role in Spec's business—and took money to satisfy its claims. *Id.*; Dkt. 63 at 12. Spec's filed the Tennessee Litigation to resolve First Data's claims that First Data had attempted to cure on its own by engaging in self-help. Dkt. 63 at 13; Dkt. 65 at 14, 21–22. Thus, Spec's claims in the Tennessee Litigation are not "inextricably intertwined" with First Data's claims. Rather, the Tennessee Litigation seeks to resolve First Data's exact claims, albeit in an unorthodox form.

Second, the Fifth Circuit addressed this exact legal issue in *Simon v. Maryland Casualty Co.*, 353 F.2d 608 (5th Cir. 1965), and held that a duty to defend could encompass the prosecution of affirmative claims by an insured. In *Simon*, the United States Government hired a contractor to perform electrical work on a military base. 353 F.2d at 610. The contractor then hired the insured, a labor subcontractor, to work on the project. *Id.* However, the subcontractor's employees were negligent on the job site and caused a fire that resulted in extensive damage to government buildings. *Id.* Instead of filing suit to establish the contractors' liability, the Government withheld about $32,000 from payments due to the contractor. *Id.* The contractor in turn withheld about $8,000 from the subcontractor. *Id.* The subcontractor contacted its insurance company and formally requested that the company participate in a judicial and administrative challenge to the Government's withholdings. *Id.* However, the subcontractor's policy only required the insurance company to "*defend* any suit *against* the insured." *See id.* at 611 n.9 (emphasis added). Because "no suit had been filed against the [subcontractor]," the insurance company refused coverage. *Id.* at 610. The subcontractor challenged the Government's withholdings despite the lack of coverage, and the Court of Claims ultimately held that the subcontractor was liable to the Government for negligence. *Id.* The subcontractor then sued its insurance company. *Id.*

11

The Fifth Circuit held that the insurance company's duty to defend included payment for the Court of Claims action, even though the subcontractor was a plaintiff in the case. *Id.* at 612–13. The court held that "the legal fees and expenses for which the insurer is liable must be those incurred in the resistance—i.e., 'defense'—of the contention of liability for damage," and the Court of Claims action fit that definition. *Id.* at 613. The court arrived at this conclusion for several reasons. First, the court reasoned that the liability established in the Court of Claims action was exactly the kind of liability for which the subcontractor had sought (and obtained) coverage:

> Both from the standpoint of the risks for which the [subcontractor] needed coverage and which the Insurer obviously meant to cover, there is a complete parallel between the policy and the result we ordain. The [subcontractor] as one engaged in the contracting business obviously had need of insurance against damage to persons and property occasioned by negligence of its servants. This is precisely what the Insurer undertook to sell and to sell undoubtedly with the same enthusiasm as any other member of the American-profit-seeking business community.

*Id.* at 613. Second, the court noted that "the Insurer got every protection" in the Court of Claims action that it would have had if the litigation "followed the traditional, orthodox pattern of a suit and judgment against the [subcontractor]." *Id.* Finally, as a practical matter, the court noted that there was "no way to force" the Government to sue the subcontractor, and the subcontractor had done everything in its power to resolve the issue. *Id.* Therefore, the court concluded, the Court of Claims decision "satisfie[d] the sense, purpose and true meaning of a 'suit against the insured'" under the policy at issue. *Id.* at 612. The court also concluded that the insurance company was liable not just for the damages awarded in the suit, but for the legal fees incurred in prosecuting the suit. *Id.* at 613. Any other outcome, according to the court, would result in an "artificial windfall" for the insurance company simply "because the form of the litigation was unorthodox." *Id.* at 614.

Despite the *Simon* court's on-point holding, Hanover argues that *Simon* does not control in part because it conflicts with Texas's eight-corners rule.[1] Dkt. 65 at 20–21. Specifically, Hanover contends that *Simon* requires the court to look to the litigation as filed, and therefore beyond the policy and the pleadings, to determine whether the litigation triggers a duty to defend. *Id.* However, this argument rests on flawed view of the role of the eight-corners rule.

The eight-corners rule exists to limit the scope of evidence that the court may consider in determining whether an insurer's duty to defend is *triggered*. *See Spec's Family Partners, Ltd.*, 739 Fed. App'x at 238 (applying the eight-corners rule and reasoning that "Hanover's duty to defend is triggered if the Claim included the potential for liability on a non-contractual ground"). This analysis "is not influenced by facts ascertained before the suit [or] developed in the process of litigation." *Primrose Operating Co.*, 382 F.3d at 552. Although the eight-corners rule often limits the court's consideration to the four corners of the policy and the four corners of a third party's pleading in court, nothing in Texas law requires the third-party complaint to be a literal complaint in court. Rather, the third-party complaint may come in the form of an out-of-court complaint, such as the Demand Letters in this case. *See Spec's Family Partners, Ltd.*, 739 Fed. App'x at 238 ("Whether Hanover owed Spec's a duty to defend turns on whether the two demand letters contain at least one claim that potentially falls within Hanover's scope of coverage under the Policy."). Therefore, in situations where suit is filed after a third party has already made a claim against the insured, the court may only properly consider the third party's out-of-court complaint and the policy

---

[1] Hanover also argues that *Aldous* is more similar to the current case than *Simon*, but the court disagrees. *See* Dkt. 65 at 19–20. The legal issue presented in *Simon* is exactly the issue presented here, and none of the factual distinctions between *Simon* and this case is material. Further, the *Aldous* decision does not discuss or even cite *Simon*. *See Aldous*, 851 F.3d 473. This is further evidence that *Aldous* and *Simon* address legally distinct, though factually similar, scenarios. Moreover, to the extent *Simon* and *Aldous* conflict, *Simon* governs as the older of two panel opinions. *See United States v. Conroy*, 567 F.3d 174, 181–82 (5th Cir. 2009) (collecting cases).

in determining whether the insurer's duty to defend is triggered. *See id.* Nothing in this analysis requires the court to consider the nature of later-filed court proceedings in determining whether a duty to defend exists.[2]

Under *Simon*, once the duty to defend has been triggered, an insurance company is liable for legal fees "incurred in the resistance—i.e., 'defense'—of the contention of liability for damage." *Simon*, 353 F.2d at 613. Here, according to Hanover's briefing, Spec's filed the Tennessee Litigation for the purpose of resisting First Data's claims that Spec's was liable for millions of dollars that First Data withheld. Dkt. 65 at 21–22. The form of litigation was "unorthodox" only because First Data, as the processor of Spec's credit card payments, exploited its position to reimburse itself for its losses without an adjudication of Spec's liability. *See Simon*, 353 F.2d at 614. The legal fees incurred in prosecuting the Tennessee Litigation were incurred in "defense of the contention of liability," and Hanover is therefore required to pay those fees as a part of its duty to defend under the Policy.

2. *Whether the Tennessee Litigation Falls Under Exclusion N*

Next, Hanover argues that its duty to defend cannot include prosecuting the Tennessee Litigation because all of Spec's claims in the Tennessee Litigation are "directly or indirectly based upon, arising out of, or attributable" to liability "under a written or oral contract." Dkt. 65 at 22. Therefore, Hanover argues, Spec's claims fall under Exclusion N of the Policy. *Id.* However, as

---

[2]This outcome also comports with the spirit of the eight-corners rule. Typically, courts apply the eight-corners rule in emphasizing the expansive nature of the duty to defend under Texas law. *See, e.g.*, *Zurich Am. Ins. Co.*, 268 S.W.3d at 491; *see also id.* (noting that under Texas law, all doubts regarding the duty to defend are resolved in favor of the duty). Here, the Fifth Circuit has already determined that First Data's Demand Letters triggered Hanover's duty to defend under the eight-corners rule. *Spec's Family Partners, Ltd.*, 739 Fed. App'x at 239. Hanover's argument would extend the eight-corners rule beyond its intended application to deny Spec's its bargained-for coverage under the Policy.

14

discussed above, the court may only consider the Policy and First Data's Demand Letters in determining whether Hanover has a duty to defend. *See supra* p. 13. The Fifth Circuit has already ruled that the Demand Letters include claims that do not fall under Exclusion N, and that Hanover therefore has a duty to defend against the claims in the Demand Letters. *Spec's Family Partners, Ltd.*, 739 Fed. App'x at 239; *see also supra* pp. 6–7. Therefore, Exclusion N does not excuse Hanover from its duty to defend Spec's against First Data's claims, including fees incurred in the Tennessee Litigation.

D.   **Insurance Code Claims**

Spec's also moves for summary judgment on its Insurance Code claims. Dkt. 63 at 27–28. Spec's alleges that Hanover is liable under Chapter 542 of the Texas Insurance Code by failing to promptly pay for defense expenses incurred. *Id.*; Tex. Ins. Code Ann. §§ 542.058, 542.060. Section 542.058 of the Texas Insurance Code provides for damages, including an 18% penalty, if an insurer "delays payment of [a] claim . . . for more than 60 days."

Hanover argues that Spec's is not entitled to summary judgment on this claim, even if Hanover is obligated to fund the Tennessee Litigation, because Spec's has not provided evidence that Hanover has paid less than what it owes under the Policy. Dkt. 65 at 26. The court agrees. Spec's briefing acknowledges that Hanover did pay some attorney's fees related to the Tennessee Litigation. Dkt. 72 at 13. However, Spec's motion provides little evidence as to how much Hanover has paid or how much Spec's believes Hanover owes under the Policy. *See* Dkt. 63. Therefore, the court cannot determine as a matter of law that Hanover has impermissibly delayed payment of claims

15

under Chapter 542, and Spec's motion for summary judgment on this claim is DENIED WITHOUT PREJUDICE.[3]

**E.    Claim for Attorney's Fees and Prejudgment Interest**

Finally, Spec's moves for summary judgment on its claims for attorney's fees under Texas Civil Practice & Remedies Code § 38.001 and its request for prejudgment interest. Dkt. 63 at 28–29. Section 38.001 provides that a party may recover "reasonable attorney's fees" for a claim based on a breach of contract. § 38.001(8). However, as discussed above, Spec's has not provided sufficient evidence that Hanover has actually underpaid in breach of the Policy. Moreover, while Spec's may be entitled to pre-judgment interest upon determination of damages owed, that determination is premature. Therefore, Spec's motion for summary judgment on these claims is DENIED WITHOUT PREJUDICE.

**F.    Request for Judicial Notice and Motions for Supplemental Authority**

Hanover seeks to supplement the record with (1) a request that the court take judicial notice of filings in the Tennessee Litigation (Dkt. 68) and (2) a motion to file supplemental authority (Dkt. 77). Spec's responded and filed a motion to strike Hanover's proffered evidence. Dkts. 71, 78.

First, Spec's objects to use of extrinsic evidence from the Tennessee Litigation because it is not admissible under the eight-corners rule. Dkt. 71. As the court ruled at the motion for judgment on the pleadings stage, "[r]esort[ing] to evidence outside the four corners of [the underlying petition and the insurance policy] is generally prohibited." *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006); Dkt. 42 at 15. Moreover, although the parties disagree

---

[3] The court acknowledges that Spec's expressly declined to provide evidence on damages because it wishes to reserve the issue for trial. Dkt. 63 at 8 n.1. However, without evidence that Hanover has actually underpaid on Spec's claim for coverage of the Tennessee Litigation as a matter of law, the court cannot grant summary judgment on Spec's Insurance Code claim.

as to the character of the Tennessee Litigation, the parties do not dispute the actual content of the Tennessee Litigation. *See* Dkts. 63 at 13, 65 at 21–22. Therefore, Hanover's request for judicial notice (Dkt. 68) and Spec's motion to strike (Dkt. 71) are both DENIED AS MOOT.

Second, Hanover moves to file supplemental authority. Dkt. 77. However, Hanover's proffered authority is a single decision that predates the pending motions by several months. *See* Dkt. 77-1. Hanover has provided no explanation for why the supplemental authority was not included in its initial motion. Dkts. 77, 79. Moreover, the proffered authority is not relevant to the court's analysis here. *See* Dkt. 77-1. Therefore, Hanover's motion for leave to file supplemental authority (Dkt. 77) is DENIED AS MOOT.

### IV. CONCLUSION

Spec's motion for partial summary judgment (Dkt. 63) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Spec's request for a declaratory judgment that Hanover has a duty to defend, including (1) the duty to defend against Claims in the Demand Letters and (2) the duty to fund the Tennessee Litigation. Spec's motion is DENIED WITHOUT PREJUDICE with respect to its Insurance Code claims, claims for attorney's fees under § 38.001 of the Texas Civil Practice and Remedies Code, and request for prejudgment interest. Hanover's motion for partial summary judgment (Dkt. 65) is DENIED. Hanover's request for judicial notice (Dkt. 68), Spec's motion to strike (Dkt. 71), and Hanover's motion for leave to file supplemental authority (Dkt. 77) are DENIED AS MOOT.

Signed at Houston, Texas on July 23, 2019.

_____
Gray H. Miller
Senior United States District Judge